# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF FLORIDA

S.G., by and through S.M.G., as Next
Friend, Parent and Natural Guardian,

             Plaintiff,

v.

WALT DISNEY PARKS AND RESORTS
US, INC.

             Defendant.

_____/

Case No. _____

6:14-cv-1899-ORL-22GJK

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

Plaintiff S.G., by and through S.M.G., as Next Friend, Parent and Natural Guardian, sues Defendant, WALT DISNEY PARKS AND RESORTS US, INC. upon the facts and causes alleged below.[1]

## I.    PREFACE

*"If it's extremely difficult for an autistic child to wait in line for a long period of time, then we should be able to address that."*

Robert Iger, Chief Executive Officer, the Walt Disney Company; Annual Shareholders' Meeting, March 18, 2014.

---

[1] This Complaint is revised only to the extent necessary to comply with the Court's Order of October 30, 2014, which severed this action from the original complaint, which was filed collectively for many families. No substantive amendments are made; the amendments relate only to changes in paragraph numbering, deletion of a statutory citation applicable only to other, former plaintiffs, and plural references to multiple plaintiffs are changed to singular.

1

## II.     JURISDICTION AND VENUE

1.      This is an action seeking damages, injunctive relief, and declaratory relief for violations of the Americans with Disabilities Act (42 U.S.C. §12131, *et seq.*), and common law.

2.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331 because one of the actions arises under federal law. Supplemental jurisdiction over any state law cause of action is proper in this Court pursuant to 28 U.S.C. §1367.

3.      Defendant WALT DISNEY PARKS AND RESORTS US, INC. ("Disney") is a Florida corporation which at all material times:

   a.      Has maintained its principal place of business in Orange County, Florida, is authorized to conduct business in the states of California and Florida, and is conducting business in Los Angeles County in the City of Burbank; and

   b.      Owns and operates six themed amusement parks (collectively, the "Disney Parks"), including Disneyland and Disney's California Adventure (collectively, "Disneyland") in the Disneyland Resort, located in Orange County, California, and Magic Kingdom, Hollywood Studios, Epcot, and Animal Kingdom (collectively, "Walt Disney World") in the Walt Disney World Resort, located in Orange County, Florida and Osceola County, Florida.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendant maintains corporate managerial business offices within this District.

### III.  ALLEGATIONS COMMON TO ALL ACTIONS

### A.  The Americans With Disabilities Act

5.  In 1990, the United States Congress made findings that laws were needed to more fully protect "some 43 million Americans [with] one or more physical or mental disabilities;" that "historically society has tended to isolate and segregate individuals with disabilities;" and that "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;" that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living and economic self sufficiency for such individuals;" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous...." 42 U.S.C. § 12101.

6.  42 U.S.C. §12182(a) provides as follows:

> *No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.*

7.  42 U.S.C. §12181(7)(B), regarding "public accommodations", provides in pertinent part:

> *The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—*
> * * *

*(l)      a park, zoo, **amusement park**, or other place of recreation;*

(Emphasis added.)

8.      42 U.S.C. §12102(1) defines "disability" in pertinent part as follows:

*(1)     **Disability***

*The term "disability" means, with respect to an individual—*

*(A)     a physical or mental impairment that substantially limits one or more major life activities of such individual;*

9.      For purposes of the "disability" definition, 42 U.S.C. §12102(2) defines

"major life activities" thus:

*(A)     **In general***

*For purposes of paragraph (1), major life activities include, but are not limited to, **caring for oneself**, **performing manual tasks**, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, **speaking**, breathing, **learning**, **reading**, **concentrating**, **thinking**, **communicating**, and **working**.*

(Emphasis added.)

10.     Title III includes a "General prohibition" against discrimination. 42

U.S.C. §12182(b)(1)(A) provides in pertinent part:

*(i)     Denial of participation*
*It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.*

*(ii)    Participation in unequal benefit*
*It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with*

*the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.*

**(iii)   Separate benefit**
*It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others.*

11.   Title III further includes a "Specific prohibition" against discrimination. 42 U.S.C. §12182(b)(2)(A)(ii) provides in pertinent part:

*. . . discrimination includes—*

**(ii)**   *a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.*

**B.   <u>Facts Common to All Claims</u>**

**1)   <u>The Disney Parks, and Plaintiff's Cognitive Impairments</u>**

12.   Disneyland, Disney's California Adventure, Magic Kingdom, Hollywood Studios, Epcot and Animal Kingdom are each "public accommodations" under the Americans with Disabilities Act.

13.   Each of the Disney Parks includes motions rides, simulation rides, attractions, shows, parades, costumed character interactions, displays and exhibits, restaurants and eating establishments, and more.

14.     Persons with developmental disorders or cognitive impairments vary widely in the precise manifestations of their impairments.  Generally, a person with a cognitive disability has greater difficulty with one or more types of mental tasks than a person with average cognitive skills, and most cognitive disabilities are the result of a biological or physiological trait of the individual.  The connection between an individual's biology or physiology on the one hand and their mental processes on the other is most obvious in the case of traumatic brain injury and genetic disorders, though less pronounced or more severe cognitive disabilities are often borne in brain structure or chemistry as well. A person with severe cognitive impairment typically needs assistance with all aspects of daily life.  A person with minor cognitive impairment typically needs assistance with some aspects of daily life.

15.     Cognitive disabilities are often classified as either clinical or functional.  Clinically diagnosed cognitive disabilities include autism, Down Syndrome, traumatic brain injury, and dementia.  Less severe cognitive conditions include attention deficit disorder (ADD), dyslexia (difficulty reading), dyscalculia (difficulty with math), and other learning disabilities.

16.     Functional cognitive disabilities focus less on the diagnosis of the disability and more on the resulting or special needs, abilities and challenges. Principal categories of functional cognitive disabilities include deficits or difficulties with: memory, problem solving, attention, reading, language and verbal comprehension, math comprehension, and visual comprehension.

17.     Clinical cognitive disabilities typically exhibit one or more of the functional cognitive disabilities.

18.     Plaintiff S.G. has a developmental disorder and a clinically diagnosed cognitive impairment.  He is substantially limited in his ability to care for himself, perform manual tasks, speak, learn, read, concentrate, think, communicate, and work.

19.     The Disabled Plaintiff whose action is prosecuted in this complaint by and through a next friend, parent or guardian is an individual who is afforded the protections afforded under the Americans with Disabilities Act.

20.     Because persons with developmental disorders encompassing cognitive disabilities display a wide variety of functional impairments, no single accommodation is available which will invariably satisfy each of their special needs. Even so, two traits are common throughout the community of persons with cognitive impairments:

   a.     The Disabled Plaintiff, like other persons with cognitive impairments, is mentally and physically incapable of waiting for significant periods of time in a line or queue.  The idle, unfocused state which necessarily results from standing in a queue causes persons on the autism spectrum, and other near-spectrum exhibitors, to over-stimulate, resulting in meltdown behaviors.  A "meltdown" is an episode familiar to those who care for autistic and other cognitively-impaired persons. Most commonly, the autistic person, when required to stand idle for

more than a few minutes or indefinitely, will begin to increasingly exhibit their individual form of "stimming," which is a tic or tendency which can take the form of humming sounds, random noises, striking out, swinging arms, hitting oneself, or flailing wildly.  A meltdown within a Disney queue is an awkward and uncomfortable experience for those in the immediate vicinity, can be hazardous to the disabled person and bystanders, and can be humiliating and embarrassing for the disabled person and his or her companions.  Invariably, requiring the person to stand in a queue for many minutes will induce meltdowns in the large majority of persons with cognitive impairments, including the Disabled Plaintiff.

b.      The Disabled Plaintiff, like other persons with cognitive impairments, is mentally and physically incapable of traveling across a park to the site of an attraction only to be told to come back later.  Explaining the disruption would be as impracticable as re-programming a computer in the middle of its computation, or placing food in front of someone with no sense of present versus future tense and telling them not to eat it now but to wait until later.  Invariably, this experience will induce meltdowns in the large majority of persons with cognitive impairments, including the Disabled Plaintiff.

**2)**     **The Guest Assistance Card: Disney's Commendable Accommodation of Plaintiff, Pre-October 2013**

21.    The Disabled Plaintiff visited one or more of the Disney theme parks on multiple occasions prior to October of 2013.  Generally, on those occasions, Disney adopted and followed systems, policies and procedures which wonderfully accommodated the Disabled Plaintiff's special needs.

22.    Visits to the Disney Parks became among the most, if not the most, joyous and eagerly anticipated experiences in Plaintiffs' lives.  The Plaintiff parent acknowledges that, prior to about October 9, 2013, taking her child to the Disney Parks was one of the few experiences, if not the only experience, which would bring obvious joy to the Disabled Plaintiff for many hours in a row, a notion very uncommon outside Disney's magical worlds.

23.    The experience of visiting the Disney Parks may have been more uniquely entertaining for the Disabled Plaintiff because of his limited ability to participate in other ordinary experiences.  For the most part, the Disabled Plaintiff and other persons with cognitive impairments cannot go to birthday parties, they cannot play on baseball teams, they cannot go fishing or bowling, they cannot go to church.  Absent other joyful experiences, the terrific product Disney developed and admirably delivered gave great hope and anticipation to Plaintiff and his family.

24.    Prior to October of 2013, Disney's system for accommodating disabled persons' special needs was universally enjoyed and appreciated by the community of persons touched by cognitive impairments.  The system was known as the "Guest

Assistance Card" ("GAC").  A redacted example of a Guest Assistance Card which was used at the Walt Disney World Resort is attached as Exhibit 1, and a redacted example of a Guest Assistance Card which was used at the Disneyland Resort is attached as Exhibit 2.  With the Guest Assistance Card, Plaintiffs knew they could expect minimal, manageable waits at the various attractions of interest, and this was precisely what Disney, through its employees, routinely delivered.  Disney did not make the Disabled Plaintiff travel all the way to an attraction only to be told to leave and come back later.  Nor did Disney make him wait more than a few minutes to board rides or enter attractions.  Very little risk of over-stimulation or meltdown ever arose.

25.     In addition, the Disney Parks' employees always appeared to have been trained to care about Plaintiffs' special needs.  Actually, the employees were so talented in this role that it did not appear they had to be trained to care; it appeared they simply did care, naturally.  They never did anything which was designed or prone to inflict embarrassment or shame or humiliation upon the disabled guest and his companions.

### 3)     The Disability Access Service: Disney's Failed Accommodation of Plaintiff Commencing October 9, 2013

26.     On or about October 9, 2013, Disney revoked the Guest Assistance Card program and its related systems, policies and procedures for accommodating Plaintiff's special needs.  Disney replaced the Guest Assistance Card program with a set of company-wide systems, policies and procedures which were connected to the

new "Disability Access Service" ("DAS") card.  A redacted example of a Disability Access Service card is attached as Exhibit 3.

27.    Even before Disney began the research and development program which culminated in the DAS card, Disney possessed a sophisticated level of knowledge of the difficulties and special needs of persons with developmental disorders and cognitive impairments.  Disney then engaged in research and development of the DAS card system for more than four years before unveiling it to the dismay of the disabled community.  Disney's knowledge is so extensive, and Disney's new Disability Access Service is so obviously discriminatory and so outrageously contrary to Disney's own knowledge of such guests' special needs, that it is inconceivable that the Disability Access Service's discriminatory impact upon Plaintiffs is an accident.

28.    The systems, policies and procedures associated with the Disability Access Service which Disney rolled out in October of 2013 were certain to create discrimination against Plaintiffs, and it was obvious that the community of persons with cognitive impairments would be harmed by the DAS.

29.    Disney has come to disfavor the presence of Plaintiff in its theme parks because:

a.    Plaintiff's disabilities include a propensity to occasionally behave loudly and erratically in public.  Disney disfavors such episodes because they upset the Disney "magic" being otherwise experienced by Disney's nearby non-disabled guests.

b.     Disney previously accommodated Plaintiff by permitting the disabled person and his companions to enter its rides and attractions without enduring idle wait times.  Disney especially disfavored doing so for those Plaintiffs who are purely autistic and who do not exhibit some other physical disorder – i.e., those who present the "invisible disability" of autism.   With persons presenting obvious, visible disabilities, such as persons in wheelchairs, the nearby guests could see that the guest's special need was being accommodated.   For autistic guests, the disability is often not apparent, leading nearby Disney guests to conclude that the person was being allowed to promptly enter the ride for reasons relating to preferential favoritism and not to disability accommodation.   Disney has always desired to curb the resentment harbored by nearby non-disabled guests who wait in Disney's infamously long queues.

30.     Either by design or as a collateral benefit from Disney's perspective, Disney's new system takes steps to end both of these Disney-perceived problems. Overtly discriminating against Plaintiff and others like him until persons with autism and other developmental disorders simply no longer visit Disney's theme parks will likely end any potential disruption of the "magical" Disney experience enjoyed by Disney's non-disabled guests.

31.     Either Disney designed the DAS with a goal or "benefit" in mind of substantially reducing the number of autistic and cognitively impaired persons who

visit the Disney Parks, or Disney recognized such "benefit" promptly upon release of the DAS and has accepted its adverse impact upon Plaintiffs. Manifestations of this motivation or acceptance include:

a.      Disney's employees, who previously exhibited only the highest care and attention for Plaintiff during his visits to the parks, turned overnight into a terrible new version of themselves. Disney's employees uniformly reversed all of their prior characteristics; courtesy was replaced with rudeness, acceptance with suspicion, understanding with impatience, and consideration with discourtesy. The switch from respect for Plaintiffs' needs to disdain for Plaintiffs' presence was so broad, and so consistent, and so abrupt, that Disney clearly trained its personnel to engage in behavior that is calculated to deter Plaintiffs from ever returning to the Parks in the future.

b.      Plaintiff and persons like him frequently visit the parks and other public accommodations bearing proof of their disability and/or special need, often in the form of medical documentation. Until October of 2013, Disney's Guest Relations employees were trained to deem such information irrelevant; when Plaintiff and others like him offered such information for review, the Disney employees courteously indicated the information was unnecessary. This was true because, if for no other reason, the Americans with Disabilities Act and regulations implementing it prevented further inquiry into

13

the nature of the disability.  But the Disney employees did not avoid all discussion of a guest's special need, especially where a guest wanted to volunteer information for the purpose of explaining a need and inquiring about a potential modification to Disney's practices. Commencing with the DAS, Disney personnel give a subtle but distinctly different response to any offers of information: the employee advises that he or she has been "instructed not to review" the information.  The difference in message creates the result of avoiding all discussion of any guest's special need, in favor of treating all disabled guests the same.  By insisting upon treating all disabled guests the same, Disney systemically refuses to consider individualized modifications of its procedures to accommodate any individual's special need.  As one Disney employee in disability services put it toward another similarly-disabled guest: "I do not care what your child's issues are".

c.     The DAS card itself reveals Disney's motivations:

1)     Disney replaced its generically-titled "Guest Assistance Card" with the stigma-emphasizing title of "*Disability* Access Service" card.   There can be no plausible good faith reason for deliberately re-naming the card in this manner.

2)     Disney now insists upon taking a photograph of the disabled guest at the commencement of each two-week period the guest

14

visits the Disney Parks.  Non-disabled persons are not required to submit to the taking of their photograph.  There can be no plausible good faith reason for adding this pre-condition to disabled persons' entry to the Disney Parks.

3) The card expressly cites its purpose as follows:

> *The Disability Access Service is designed for Guests who are unable to tolerate extended waits due to disability. This service allows Guests to schedule a return time that is comparable to the current queue wait for the given attraction.*
>
> *This service does not provide immediate or priority attraction access.*

Disney cannot possibly miss the facial incongruity in this language.  The first sentence purports to help the Plaintiffs avoid waits, while the second sentence institutionally mandates waits.  A "return time" equal to other patrons' "current queue wait" *is* a wait.  And, for the Disney Parks, it is definitively a *long* wait.  Disney's biggest obstacle to providing a perfect outing for all its guests is its notoriously long wait times.  One-hour wait times are the norm.  The primary difference for non-disabled patrons is that they can tolerate and withstand the dreaded wait times, while Plaintiff cannot.  In the third sentence, Disney notes a difference between immediate access and priority access; that is, immediate access

is not necessarily preferential or superior treatment in comparison to the access afforded other guests. The importance of this distinction is unclear, as Plaintiffs have never sought either immediate access or "priority" access.

4) The first and last of the "Terms and Conditions" of the DAS Card are:

*Your scheduled return time does not provide immediate access upon your return.*

*When utilizing this service, it is possible to experience waits greater than the posted wait time.*

Disney cannot in good faith miss the incongruity of these provisions. To suggest that the disabled guest must schedule an appointment for a ride, for whatever time in the future would be the start or boarding time if the guest were to stand in line, while not promising to allow the guest onto the ride at the appointment time, is outlandish. Disney mandates the making of an appointment time but refuses to commit to honoring the appointment time. By doing so, Disney refuses to commit to providing an accommodation. Plaintiffs do not control and cannot predict whatever variables may exist to influence Disney's decision to accommodate a guest by honoring a promised wait time. The second sentence

establishes that even if the DAS is followed, other, non-disabled guests may receive more favorable service.

5) The very cover of the DAS card gives the disabled guest this instruction:

*At each attraction, please show this card to an attraction Cast Member to notify them of your assistance needs. They will assign a return time based on the current wait.*

*When available, please use Disney FASTPASS® service to reduce your wait time.*

This language constitutes an admission that Disney will not, under any circumstances, eliminate or reduce a wait time. The first sentence invites a discussion of a guest's special needs. The second sentence establishes that no matter what special need the disabled guest may want to discuss, one and only one accommodation will be offered, and it is to wait as long as a non-disabled guest waits. (Or, given Disney's lack of commitment to honoring a promised return time, perhaps even longer.) The third sentence confirms that, under any circumstances, the disabled person will experience an extended wait, because he or she is encouraged to take other measures to reduce the wait time.

32. When Disney unleashed the DAS system on its unsuspecting disabled fans, Disney publicly announced that only the highest-functioning persons would be

accommodated by the DAS system and that others would be accommodated based upon their individual special needs.  Disney knew, as admitted by Mark Jones, Disney's Manager of Domestic Services for Guests with Disabilities, that other autistic persons and other persons with cognitive impairments would require individualized attention in order to accommodate their special needs.  However, Disney expressly trained its Guest Relations employees not to acknowledge any individual special needs and not to provide any individualized accommodations.  As the DAS card provides on its cover, no matter what the special need, the "accommodation" is the same.

33.   On March 27, 2014, the United States Centers for Disease Control and Prevention released a report concluding that in 2010, one of every 68 American children was identified as autistic, an increase of 30% in two years.  Disney, as one of the world's premier providers of goods and services for children, does not miss such demographics and trends.

34.   Disney knew the DAS would be universally despised by guests with cognitive disabilities, because the system would not accommodate their special needs.

35.   The entire DAS is predicated upon the concept that Disney will accommodate Plaintiff, not by relieving him of the burden of *waiting*, but by relieving him of the burden of waiting *in lines*.  However, when Plaintiff has visited the Parks since October 9, 2013, he reported as required by Disney to City Hall or Guest Relations, and was immediately met with an extended wait, *in line, just to*

*obtain the DAS card*.  Disney is too smart to genuinely believe that it reasonably accommodates disabled persons by making them wait in lines as a precondition of being relieved of the burden of waiting in lines.

36.    Disney knows the DAS makes the wait time of disabled persons even *longer* than the notorious wait times which non-disabled persons are already required to endure in the Parks.  When the wait time associated with reporting to Guest Relations to complete the stigmatizing procedure of having a photograph taken, a procedure not required of non-disabled persons, is added to the assigned and designated wait time for any particular ride, the disabled person's wait is, by definition, *longer* than the non-disabled person's wait time.  If a disabled person waits one hour at Guest Relations to obtain the DAS card, then complies with the DAS and rides one ride which has a one-hour wait time, the disabled person's wait time is two hours, while the non-disabled person's wait time is only one hour.  If the disabled person rides five rides, each with a one-hour wait time, the disabled person's wait time is 12 minutes longer per ride than the non-disabled person's wait time.

37.    Disney's Disability Access Service systematically builds in still another mechanism for ensuring that disabled persons spend *more* time waiting than non-disabled persons, and that they do so *in lines*.  Under Disney's prior Guest Assistance Card program, the guest obtained a card which was effective for the succeeding 14 days with no further administration or hassle.  But under the new DAS, anything resembling an accommodation beyond the baseline DAS, such as a single Fastpass, is

a "one-time only" accommodation, and it is only provided to those who push back against Disney in the futile effort to make Disney's employees, who have been trained not to listen, understand that the DAS does not accommodate persons with cognitive impairments.  For this reason, the disabled guest must report to Guest Relations *every day* upon entry into one of the Parks.  The disabled guest must then repeat the first day's one-hour wait in the Guest Relations line, all for the privilege of repeating the prior day's complaints in vain, hoping that someone will listen or that someone will provide something in addition to the DAS which, standing alone, is nothing.  There can be no good faith reason for Disney to require families in which someone has a developmental disorder or cognitive impairment to begin their day in such an unpleasant fashion.

38.     Disney's recent effort to use scattered "kiosks" to give out ride times does not ameliorate this problem.   Apparently Disney proposes, in lieu of walking all the way to an attraction simply to get an appointment for later, the guest can walk all the way to a central kiosk to get an appointment for later.  That is, Disney suggests that walking to a central kiosk to experience nothing is a solution to walking to an attraction to experience rejection.  The kiosk arrangement was apparently created to permit guests using Disney's Fastpass and Fastpass Plus systems to identify rides and attractions they can make appointments for, or to permit them to impulsively change plans and visit different attractions based upon the then-current wait times or seating availability.   This arrangement is no

accommodation for guests who are incapable of making and changing spur-of-the-moment plans.  This arrangement achieves only:

a.     More total walking, back-and-forth to kiosks to schedule appointments.

b.     More total wait time, because:

1)     Lines exist at the kiosks;

2)     Even if Disney gives the guest an appointment time which is 10 minutes less than a current ride wait time, this is simply Disney's effort to robotically ensure that disabled persons wait as long as everyone else, including the time they spend going back-and-forth to the kiosks, which Disney apparently believes takes about 10 minutes each time; and

3)     A line exists when the guest returns to the ride, making the total wait time longer for the disabled guest than the non-disabled guest.

c.     Less convenience than is necessary for a non-disabled guest, because the disabled guest, who started their day in line at City Hall or Guest Relations, now must travel repeatedly to designated kiosks to obtain ride return times, wait in the line at each kiosk, wait for each return time, and then wait at each attraction at the assigned time.  If Disney's new DAS is intended to eliminate _line_ times for disabled persons while making certain their total _wait_ times are the same as everyone else's,

21

and if the DAS is intended to work in tandem with the kiosks, the kiosks achieve the opposite. They simply ensure disabled persons must wait in three lines instead of one, and that their total wait time is longer than everyone else's.

d.   Less routine and predictability of experience, because:

1)   A guest cannot know what to expect about the availability of a ride until arriving at the kiosk, just as is the case when arriving at a ride, and the cognitively-impaired guest has less flexibility to simply change plans at the kiosk;

2)   A routine circuit through the Parks becomes impossible, when one must go back-and-forth to the kiosks in between attractions;

3)   Disney moves the kiosks, and occasionally even changes their number, is it did when Disney reduced the kiosks in Disney's California Adventure from four to three; and

4)   The employees at the kiosks are not willing or trained to listen to guests' explanations of their individualized, special needs.

**4)   The Disability Access Card: A Contrived Solution to a Non-Existent Problem**

39.   Beginning in approximately May of 2013, public news and media outlets reported that Disney was suffering from a problem of "rented invalids." Reportedly, persons were fraudulently arranging to become companions of disabled

22

persons they otherwise did not know, purely to skip the queues for prompt entry into Disney attractions and rides. The news pieces, which suddenly appeared and focused on a problem which had apparently gone unnoticed for decades, seemed to spread virally.

40.     The "rented invalid" problem never existed to any extent which necessitated a massive overhaul of Disney's policies for accommodating disabled persons. Rather, Disney influenced the release and/or spread of such articles, for the specific purpose of creating cover for its planned rollout of the DAS program. Disney wanted the public to view the "rented invalid" problem as an epidemic of fraud, with Disney as its victim.

41.     One facet of the DAS is that guests with mobility challenges are removed entirely from the DAS system. Disney now refuses to even acknowledge that persons in wheelchairs are disabled. Guests with wheelchairs are now told that the queues are fully accessible for them so they may wait in lines with the non-disabled persons. Even if the so-called "rented invalid" problem ever really existed, once Disney removed mobility-challenged guests from the DAS, the problem was solved. The systemic abuse about which Disney became suddenly frantic in 2013 could never be carried out by or with persons with developmental disorders or cognitive impairments. If there was a problem with non-disabled guests "renting" persons in wheelchairs for a day, the problem could not occur with persons like Plaintiffs. No fake companion would "rent" an autistic guest for a day in the Parks, because the eccentricities of the disabled person's visit to the Parks would render

the day completely unpleasant for the fake companion. Autistic persons are mentally and physically incapable of browsing or wandering randomly looking for an attraction that might be inviting. Many must follow the same pattern through the Parks, every time, riding the same rides, in the same order, every time. Others must ride the same ride, over and over, for several hours at a time. They do not stop for casual dining, or to rest, or for shopping or picture-taking. They cannot honor the schedule or priorities of their companions. Their day does not resemble a day anyone who would "rent" them might want. By completely eliminating persons with mobility challenges from the DAS and making those disabled persons wait in queues, Disney eliminated the epidemic it wants the public to believe existed. There was no longer a reason to roll out the DAS at all.

42.    Disney's cited justification for abandoning Plaintiff's right of equal access to Disney's facilities: "[The GAC] had been abused and exploited to such an extent that we were no longer able to sustain the program" is simply meritless. The so-called problem of widespread abuse of Disney's accommodations never existed, and never could have existed, in connection with Plaintiffs.

### 5)    DAS Disinformation: Disney Places Outrageous and Insulting Videos on the Web for Its own Spin Control Benefit

43.    Public blogs and social networking websites are a very common form of communication within the autistic community. Since October of 2013, those sites

have consistently shown how widely and acutely despised Disney's new form of "accommodation" is.

44.    Fearing for its own reputation within the highly profitable non-disabled community, Disney arranges for messages to be posted on such websites, without acknowledging Disney's sponsorship, of well-scripted positive messages which are actually from Disney employees or agents.

45.    Disney has sponsored, without attribution or acknowledgement, numerous videos on the internet which are inexplicably contrary to everything Disney knows about cognitive impairments.  There can be no good faith reason for sponsoring false messages.  These videos are designed to induce the non-disabled community to believe that Disney is really trying to accommodate persons with cognitive impairments.  For viewers within the disabled community, the videos are even worse because they *blame the autistic person* for their own failures to appreciate Disney's Parks.  They go so far as to propose that the reason an autistic person cannot tolerate a ridiculous queue time is their own lack of effort or control; they can self-teach themselves to handle such environments, and if they were to simply try harder, they would see that one-hour waits are just fine.  In October 2013 a video appeared advising parents of children with developmental disorders to have their child practice waiting before visiting the park.  Disney knew disabled Plaintiffs are incapable of waiting in long lines without melting down yet treated the harm caused by waiting as if it were a skill which could be acquired with repetition.

46.    Disney knows that viewers of these messages who are part of the disabled community or who have any true understanding of cognitive impairments will be insulted and disgusted, because Disney is too smart to be delivering such inane messages in good faith, just as Disney is too smart to genuinely believe autistic persons can go all the way to a ride and calmly and peaceably accept an instruction to come back later.  Disney also knows that it is very common for disabled persons to visit the Parks with only one parent companion – this is particularly common for autistic children who live in the vicinity of the Parks and visit more frequently using annual or extended passes.  A single parent accompanying an autistic child cannot leave the child alone or with another person; there is no choice but to take the child all the way to the ride only to have the child learn that he or she is prohibited from riding it.  More aptly, the child will be told he or she is prohibited from riding the ride "at this time," but the temporal portion of the prohibition is too complicated for the child to understand.

47.    Illicitly-supported videos are not designed to actually aid persons with cognitive impairments or their caretakers.  Disney is too knowledgeable to propose that an instructional video could ever meaningfully teach or encourage persons with cognitive impairments to "practice waiting in line," or to "browse in the stores" during the wait time, or to similarly kill time by using the restroom or having a snack.

48.    These messages, posts and videos are not designed for their stated audience, which Disney knows will know better.  They are designed only to cover

Disney's reputation in the non-disabled community, in case any of the disabled community's widespread despair about the DAS system should spill over to the non-disabled community.

### 6) Feigned Accommodation: Inconsistently Doling Out Occasional Ride Passes to Quiet Complaining Guests

49.     Upon creating and implementing a system that was destined to create horrible experiences for persons with cognitive impairments, with the result of deterring persons with cognitive impairments from visiting the Parks, Disney further trained its Guest Relations employees that these guests were likely to complain about their experiences and about the new system's total failure to accommodate their special needs. The employees were instructed to tolerate whatever resistance they could, and when absolutely unavoidable, the employees could consult with a supervisor, and upon receiving approval, give up to three no-appointment ride entry passes to the guest. Even during the first few months of the system, the Guest Relations employees arbitrarily and capriciously extended these passes to Plaintiffs. Occasionally the employees granted three passes; sometimes two. Other times the employees advised that they could provide no passes at all and could only provide the DAS card and nothing more, because Disney policy firmly prohibits any accommodation beyond that afforded by the DAS card. Even when two or three passes were extended, some families of disabled guests were advised that Disney policy firmly provides that no further passes could or would be made available that day. Others were advised that more passes would be made available

27

that day, but only if the guest were to return to Guest Relations to obtain them, which the employees know is unworkable because returning to Guest Relations would be contrary to the disabled guests' special needs. Some disabled guests were even told at one Disney Park that additional passes were available as an accommodation beyond the DAS card, while being told on the next day, at a different park during the same visit to the Walt Disney World resort, that Disney's new DAS policy strictly prohibits the granting of such passes.

50.     Disney's new policy of inconsistently, arbitrarily and capriciously granting additional passes only when a guest loudly complains, creates complete unpredictability for families in which someone has a developmental disorder or cognitive impairment. Disney knows this arbitrariness will further deter families in which someone has a developmental disability or cognitive impairment from visiting the Parks. If the families cannot rely upon Disney and its employees to graciously, caringly and empathetically accommodate disabled persons' special needs as Disney always previously did, the families will not risk the disabled person's calmness and stability by visiting the Parks. Guests living more than a day-trip away will not risk the investment of an extended vacation.

51.     Disney's arbitrariness is also destined to deter further visits to the Parks because Plaintiffs and similarly-situated guests simply do not welcome the notion of having to start each day in the Parks by reporting to Guest Relations and becoming a complainer, with the hope of obtaining a marginally meaningful

accommodation such as random Fastpasses. Starting the day so unpleasantly is the antithesis of any person's anticipated day in one of the Parks.

52.      Families in which someone has a cognitive impairment are well-connected in web groups and social networking communities. Some of those discussion outlets are Disney-specific and are monitored by Disney, either openly or secretly. Disney expected the word to quickly get out within those virtual communities that Disney no longer meaningfully accommodates persons with cognitive impairments.

53.      Disney's systemic arbitrariness continued into January of 2014. After three months of discriminating against persons with cognitive impairments and providing only the pretense accommodation described above to those who complained, Disney began uniformly announcing to families in which a guest has a cognitive impairment that even the passes that Disney had been inconsistently, arbitrarily and capriciously doling out to complaining guests were no longer available at all. No accommodation beyond the DAS card would be made available to anyone.

54.      Disney can of course readily modify the DAS or roll out alternate procedures which would accommodate Plaintiff's needs, with no alteration in Disney's way of doing business. The best indicators of this simple feasibility include:

a.    Even before ADA existed – even before Disney had an express statutory obligation to accommodate disabled persons – Disney accommodated disabled persons, admirably.

b.    When ADA was passed and for more than 20 years thereafter, Disney admirably accommodated the needs of guests with developmental disorders and cognitive impairments.

c.    Even after conjuring up the DAS, Disney created a Magic List concept. Disney refuses to publicize its Magic List, lest it actually become widely known within the autistic community.

d.    At about the same time that Disney rolled out the DAS, or shortly thereafter, Disney started a test release of its Magic Band product, which enables rides to be scheduled by appointment.  The band could easily be programmed to allow the disabled wearer prompt access to all rides, or to specific rides.  Disney refuses to make Magic Bands available to persons outside those staying in the Disney resorts.

7)    **A Secret Accommodation, Unknown to Disabled Guests, is No Accommodation at All**

55.    After months of systemically-designed unpredictability, followed by the total predictability of no accommodation at all beyond Disney's impossible one-accommodation-fits-all DAS, Disney began inconsistently, arbitrarily and capriciously doling out still another occasional accommodation, internally known as the "Magic List."  The Magic List is a secret list of persons to whom Disney will

automatically extend, without the stigma of a "Disability" card, and without a mandatory photograph, and without the newly-ingrained disrespect of Disney employees, five no-appointment ride entry passes.

56. The Magic List does not perfectly accommodate the special needs of all persons with cognitive impairments, but it is considerably better than the recklessly inadequate DAS card.

57. Disney is withholding the existence of the "Magic List" from the broader community of families in which someone has a cognitive impairment. By doing so, Disney continues to deter families from visiting the Parks or making plans to do so. Families of persons with developmental disabilities or cognitive impairments remain unwilling to return to the Parks, in fear that the disabled person will experience otherwise avoidable meltdowns and otherwise be subjected to discrimination and humiliation in the Parks. If the accommodation to be provided to persons on the Magic List were refined, and if the Magic List were made known to disabled persons and their families to allow them to predict their likely experience prior to incurring the risk and investment of traveling to the Parks, this deterrence would be substantially reduced or eliminated.

8) **Disney has Demonstrated Callous Disregard for the Rights of Plaintiff, Who has a Developmental Disorder**

58. As alleged above, Disney possesses sophisticated knowledge of the special needs of persons with cognitive impairments. Disney did not accidentally roll out a system which is so distinctly inconsistent with the special needs of such

31

persons. Disney did so intentionally or recklessly, to cleanse its Parks of what Disney views as the anti-Magic of such persons' stimming, tics, and meltdowns, or subsequently intentionally or recklessly accepted the damage to Plaintiffs as a benefit to Disney.

59.  In connection with the planning and implementation of the DAS, Disney:

- Spent years designing a system which is wholly inconsistent with Disney's own sophisticated knowledge base about persons with cognitive impairments;

- Disseminated false information about a problem which never existed to any meaningful extent, and which never existed to _any_ extent for persons with cognitive impairments, to gain cover for its planned unveiling of a harshly discriminatory program;

- Implemented a new accommodations system which wholly eliminated accommodations for guests with mobility impairments, thus erasing the problem which Disney had contrived as cover; there remained no epidemic for Disney to "cure" by creating a new accommodations program for persons with cognitive impairments, who were never part of the now-eliminated problem;

- Unleashed the DAS system, to the entirely predictable dismay of the community of families which include persons with cognitive impairments;

- Caused or allowed families in which a person has a cognitive impairment to suffer horribly unpleasant visits to Disney's Parks for several months, with knowledge that such experiences would become widely known and would deter other such families from bringing their visible "non-Magic" into the Parks in the future;

- Trained its employees to adopt positions toward guests with cognitive impairments which involve offering feigned accommodations which were destined to be soundly rejected, predictably creating a newly disrespectful and unkind attitude not previously exhibited by Disney's employees;

- Inconsistently, arbitrarily and capriciously provided "one-time only" additional accommodations only to families who complained loud enough, and even then only to an extent which was not genuinely designed to accommodate the guests' special needs. The principal purpose for these arbitrary "one-time only accommodations" was simply to give Disney's employees something to ameliorate their own unkind treatment of disabled persons, and to allow the employees to quiet the loudest complainers;

33

- Kept a secret "Magic List" of persons Disney is willing to accommodate, without disseminating information about the existence of the list, and without advising the public as to the criteria which is being used by Disney to exclude many disabled persons from the Magic List while making it available to others;

- Made plans to officially roll out a new technology which could be used to accommodate Plaintiff's special needs only after Plaintiff and others like him have been deterred from visiting the Parks;

- Systemically refuses to communicate with guests about their accessibility needs, to avoid addressing any possible modifications to Disney's plans and procedures which might accommodate such needs.

60.     Disney maliciously caused injury to Plaintiff, discriminating against him in the short term with the expectation or known consequence of deterring him and other similarly-situated persons from visiting the Disney Parks in the long term.

61.     Disney cruelly and oppressively subjected Plaintiff to discrimination for no defensible, honorable purpose.

62.     Disney fraudulently disseminated or encouraged the dissemination of false information, for the purpose of creating cover to prevent discovery or public discussion of its scheme.

**Attorneys Fees and Litigation Expenses**

63.     As a result of Disney's callous discrimination and violations of the Americans with Disabilities Act, Plaintiffs have been required to retain the services of undersigned counsel.   Plaintiffs have agreed to pay undersigned counsel a reasonable attorneys' fee and have agreed to reimburse the attorneys' reasonably-incurred litigation expenses.   Plaintiffs are entitled to recover their reasonable attorneys' fees and costs in filing this action, pursuant to 42 U.S.C.A. Section 12205.

## IV.     CAUSES OF ACTION

### COUNT 1

**Violation of the Americans with Disabilities Act**
**42 U.S.C. §§12131, *et seq.***
***S.G. v. Disney***

64.     Plaintiff S.G. incorporates and re-alleges paragraphs 1 through 63 above.

65.     S.G. has severe autism, mitochondrial disease, gastrointestinal and esophageal problems indicative of Crohns Disease, pica disorder, attention deficit hyperactivity disorder (ADHD), and she is assigned an ICD-9-CM code for wandering.

66.     S.G. is a person with a disability, as that term is defined in 42 U.S.C. §12102(1).

67.     S.G. is six years old and is generally in the care of her mother, S.M.G, who brings this action as S.G.'s next friend, parent and natural guardian.

68.     S.G. and S.M.G. are residents of Dorchester County, South Carolina.

69.    S.G. sits in a hyperbaric oxygen chamber two hours each day to assist with her brain and sleep patterns.  During her time in the oxygen chamber, S.G. watches Mickey Mouse on *YouTube,* because she loves all things Disney.

70.    S.G. is non-verbal and communicates largely by pointing gestures.

71.    In 2011 and 2012, S.G. and S.M.G. visited the Walt Disney World Parks. S.G. carried the red card associated with the Guest Assistance Card system, and she was admirably accommodated.  During those visits, S.G. exhibited a nature and extent of joy that she rarely showed in any other setting.  S.M.G. was always proud and joyful of the opportunity to bring to her beloved child a level of happiness which she rarely showed elsewhere.

72.    Because of these fond memories, S.G. and S.M.G. made plans to return to Walt Disney World in December 2013.

73.    S.G.'s cognitive impairments require certain accommodations in order for S.G. to experience the Disney Parks in a way equal to other, nondisabled children.

74.    S.G. is incapable of waiting idly in a line without experiencing a meltdown.  Idle waiting is a stressor which escalates S.G.'s stimming behavior toward meltdown.  S.G.'s stimming often takes the form of excited crying, biting her hand, falling to the ground and banging her head.  She will also make thrusting/humping movements, eat non-edible materials, and scream.

75.    Although S.G. now has a stroller into which she can be strapped, controlling her is challenging.  The ability to wheel her directly to a ride entrance and promptly place her on the ride avoids many of the challenges associated with

S.G.'s disability.

76.     Requiring S.G. to go to the front of a line so her party can get the DAS card signed with a return time, only to then wheel her away with the intention of returning later places S.G. in harm's way, because once S.G. has seen a ride she is incapable of comprehending a mandated delay in experiencing it, with or without a line.  Once S.G. has seen a ride, she must then either ride it or melt down.  By refusing to modify its procedures so as to permit S.G. to enter the ride, Disney assures and causes the meltdown.

77.     S.G.'s disorders also cause her to have to experience certain Disney attractions repetitively.  S.G. is a "repeat rider."  This is a propensity common among autistic persons – a variety of the need for consistency, order and routine.  S.G. will experience a particular ride or attraction, such as Thunder Mountain, over and over, for several hours at a time.  Disney personnel are very familiar with the repeat rider type of guest.

78.     Disney's new DAS prevents S.G. from experiencing the full enjoyment of Disney's Parks.  Her experience is innately inadequate and unequal in comparison to the experience of Disney's non-disabled guests.

79.     Prior to October 2013, S.M.G. telephoned Disney on at least three separate occasions, each time leaving a voice message explaining the hardship the then anticipated new DAS card would cause to S.G. and her.  Disney: (1) failed to return any of the messages; and (2) failed to modify the policy for the needs of S.G. and others like her.  Instead, having notice of how this would affect S.G., Disney

launched the DAS anyway.

80.    As a result of Disney's refusal to consider modified procedures which would accommodate S.G.'s needs and allow S.G. to have an equal experience at the Parks in comparison to non-disabled persons, S.M.G. reasonably canceled her family's trip to Walt Disney World in December 2013.

81.    S.G. has become so deterred by Disney's behavior that this September 2014, the Sunshine Foundation makes S.G. eligible for a trip to Disney but S.M.G. asked them for an alternative because of Disney's failure to grant S.G. accommodations that would allow S.G. to have an equally good time as a nondisabled person at the Disney Parks.

82.    Notwithstanding Disney's highly sophisticated knowledge of the needs of persons with cognitive impairments, and notwithstanding Disney's historic ability to accommodate S.G.'s special needs, Disney implemented a policy that fails to accommodate the needs of S.G. and other guests like her, and has refused to modify it.

83.    Disney personnel showed no willingness or desire to improve the experience for guests like S.G.

84.    S.G. and S.M.G. have already visited the Parks considerably less frequently than they intended, a situation which continues to this day.  Their interest in attending Disney Parks is substantially reduced.  S.M.G. knows that attending Walt Disney World in the future will again be a supremely un-

accommodating experience, one which would be destructive for S.G. She cannot tolerate another un-enchanting experience for S.G.

WHEREFORE, Plaintiff S.G., by and through S.M.G. as her next friend, parent and natural guardian, prays that this Court adjudicate this dispute and enter an Order:

- Enjoining Defendant to cease the practices which are causing discrimination against Plaintiff on account of S.G.'s disability; and

- Enjoining Defendant to reasonably modify its policies, practices, and procedures to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations; and

- Establishing Court-approved remedial measures that Disney must implement, to prevent Disney from further discriminating against Plaintiff when they visit the Disney Parks; and

- Establishing Court-approved requirements for information dissemination about Disney's remedial measures and modified policies, to prevent Disney from further deterring Plaintiff from visiting Disney Parks as a result of anticipated discrimination; and

- Establishing a monitoring program to ensure Disney's compliance with the Court's Orders; and

- Awarding reasonable attorney's fees as may be determined by the Court in favor of Plaintiff and against Disney; and

- Awarding reasonable litigation costs as may be determined by the Court in favor of Plaintiff and against Disney; and

- Such other relief as this Court may find just and equitable.

Dated: November 19, 2014

_____

ANDY DOGALI
Florida Bar No. 0615862
Dogali Law Group, P.A.
101 E. Kennedy Blvd., Suite 1100
Tampa, Florida  33602
Email:  adogali@dogalilaw.com;
cnicoletti@dogalilaw.com
Tel:    (813) 289-0700
Fax:    (813) 289-9435
*Trial Counsel*

And

EUGENE FELDMAN
*Pro Hac Vice to be submitted*
gfeldmanlaw@att.net
Eugene Feldman, Attorney at Law, APC
555 Pier Avenue, Suite 4
Hermosa Beach, CA 90254
Tel:  (310) 372-4636
Fax:  (310) 372-4639
Email:  gfeldmanlaw@att.net
*Attorneys for Plaintiffs*

40